181 P.2d 161

ADES et al. v. SUPREME LODGE ORDER
OF AHEPA et al.

No. 5013.

Supreme Court of New Mexico.

May 22, 1947.

Sam Dazzo and R. J. Nordhaus, both of Albuquerque, for appellants.

Rodey, Dickason & Sloan and Frank M. Mims, all of Albuquerque, for appellees.

SADLER, Justice.

This is an appeal from a final decree in suit for specific performance of a purported contract to purchase real estate. Relief was denied and one of the original plaintiffs, Gus Bruskas, appearing before us as appellant, seeks reversal of the decree dismissing his complaint.

The defendant, Supreme Lodge Order of Ahepa, is a charitable organization, the membership in which, in the main, is made up of persons of Greek extraction. It constitutes the governing body of the national organization composed of subordinate lodges throughout the country. The defendant, Ahepa Silver District Sanatorium, Inc., is a New Mexico charitable corporation and

an agency of the national organization. At all times material to this controversy, it held title to the real estate involved in this suit. The two corporations conducted a tuberculosis sanatorium from 1937 to 1941 in buildings erected on the premises in question.

The plaintiffs long had been active and prominent in the affairs of the two corporations when the transaction out of which this suit arose took place. The one taking the leading part in such transactions, George Ades, had held the office of President and all subordinate offices of the Gallup Chapter and the office of District Governor of the district which includes New Mexico. He had also been a sponsor of the sanatorium corporation.

The plaintiff (and appellant) Gus Bruskas was likewise a member of Ahepa and was president of the lodge's Albuquerque Chapter in the years 1935, 1936, and 1937 during which the Sanatorium property was purchased. He was the Albuquerque Chapter's delegate to the national convention of Ahepa every year from 1936 to 1943. He had been interested in opening the Sanatorium and had helped raise funds for this purpose. He attended every national convention of the order and favored continuance of the sanatorium against strong sentiment in the order for closing it.

The parent organization of Ahepa held its national convention at Atlanta, Georgia, in December, 1941. A resolution was adopted at this convention authorizing the Supreme Lodge to sell the sanatorium property. Shortly thereafter it was closed and the property subsequently leased to New Mexico Board of Public Health. While so leased and on October 20, 1945, Ades, in Albuquerque, talked with the Supreme President of the Order of Ahepa, Harris J. Booras, in Chicago, by long distance telephone, making an offer of $50,000 for the property on behalf of himself and another called a "partner" in the deal, Bruskas, although the name of the partner was not disclosed to Booras, Supreme President. The price was agreeable and Booras informed Ades Ahepa would sell. No details were discussed, although mention was made by Ades of a $24,000 mortgage on the property which the purchasers would prefer to continue in effect, though prepared to pay all cash. Booras informed Ades in this conversation that it would be necessary that he and his partner send $10,000 earnest money to "verify" the sale and promised Ades to include all these matters in a wire to him specifying terms of the sale. Booras added that he would instruct the Order's Albuquerque attorneys to close the sale and emphasized that Order of Ahepa was to pay no broker's commission.

Negotiations were entirely oral down to this point and void of details, except for agreement on sale price, amount of down payment and that Ahepa was to pay no

commission. They were barren of such important details as the time within which the sale should be completed, whether the purchase price was to be all cash or cash only for excess of purchase price over amount of the mortgage, the purchaser assuming the mortgage, as well as any other terms essential to the completed transaction. However, on October 20, 1945, the telephone conversation was followed by a telegram from Booras as Supreme President Order of Ahepa in Boston, Massachusetts, to Ades in Albuquerque, reading as follows:

"GEORGE ADES LIBERTY CAFE:
"ALBQ

"OFFER TO SELL SANITORIUM FOR FIFTY THOUSAND DOLLARS CASH IS ACCEPTABLE TO THE SUPREME LODGE STOP TO BE BINDING OFFERER MUST BY LETTER ADDRESSED TO ME AS SUPREME PRESIDENT STATE THAT HE AGREES TO PAY FIFTY THOUSAND DOLLARS CASH FOR SANITORIUM PROPERTY AND ACCOMPANY HIS LETTER WITH TEN THOUSAND DOLLARS CERTIFIED CHECK PAYABLE TO SUPREME LODGE ORDER OF AHEPA STOP ANOTHER CONDITION BEING THAT WE SHALL HAVE ON OR BEFORE NOVEMBER 30TH TO COMPLETE TRANSACTION STOP UPON RECEIPT OF LETTER AND CERTIFIED CHECK WE WILL COMMUNICATE WITH YOU AND OFFERER FURTHER FOR FINAL ARRANGEMENTS TO PASS TITLE STOP UNDERSTOOD NO COMMISSION TO BE PAID BY AHEPA TO ANYONE

"HARRIS J. BOORAS SUPREME PRESIDENT ORDER OF AHEPA."

On the same date, October 20, 1945, Ades acknowledged receipt of the telegram by a letter to Booras as Supreme President Order of Ahepa, reading:

"October 20, 1945
"Mr. Harris J. Booris, Supreme Pres.
"Order of Ahepa
"10th Street
"Boston, Mass.
"Dear Harris:

"Received your telegram and am enclosing certified check in the amount of $10,-000.00 as requested in the telegram.

"We perfer to have the mortage of $24,-000.00 transfered to us from the Occidental Life Insurance Company: We will have the balance of $16,000.00, in escrow here in the bank as soon as the papers are ready.
"Yours truly,
"By Georges Ades"

Receipt of the certified check for $10,-000 was acknowledged by a letter from Supreme President Booras to George Ades, dated October 29, 1945, reading as follows:

"Harris J. Booras
"Supreme President

Office of the Supreme
President
Ten State Street
"Boston, Mass.
"Order of Ahepa
"Supreme Lodge Headquarters
"Washington, D. C.

"29 October 1945

"Mr. George Ades
"c/o The Liberty Cafe
"103 West Central Avenue
"Albuquerque, New Mexico
"My dear George:

"In response to my telegram I have received the $10,000 check relative to the sale of the property for the sum of $50,-000. In the near future I shall make arrangements to either come to Albuquerque or to despatch some representative of Ahepa instead to consummate the deal. In the meantime, I would like to know as to who is purchasing the property and the address of same, for, according to your letter, it seems that you have sent the check and that you seem to be the purchaser.

. "I enclose herewith copy of a letter which has been sent to Attorney Rodey, whom I have asked to act as our attorney to look up the status of the Silver District Sanitorium and as to what votes, authorities and documents are needed in order to consummate the transaction. You will please see him immediately, and, after consulting with him, report to me as to what is to be done.

"Mr. Rodey will also check into who the reported officers are now and as to whether or not we have to have special meetings to elect new officers to assign deeds and documents.

"With my best wishes to you and with the thanks of the fraternity for your very fine efforts, I remain,

"Cordially and fraternally yours,
"s/ Harris J. Booras
"Harris J. Booras
"Supreme President

"hjb/rm
"Enc."

The foregoing letter was dated October 29, 1945. On October 31, 1945, Bruskas was in Washington and talked to Booras and told Booras that Bruskas and Ades were buying the property. Booras said that he was glad of this. Booras then also told him that Ahepa was willing to sell on the basis of being paid merely for its equity, with the existing mortgage to be assumed by Bruskas and Ades.

On October 31, 1945, the Albuquerque attorneys for Ahepa wrote Ades to the effect that they had been advised to contact him "in regard to the sanatorium and to fix up the papers for contemplated sale and so

forth." On November 7, 1945, Booras wrote to Ades as follows:

"My dear Brother Ades:

"I had assumed from our talks in Chicago as well as from our talks on the phone that there was an outside purchaser interested in the property, and, accordingly, I had wired you that we had accepted the offer, subject, of course, to the approval of the Supreme Lodge, and that I should receive a letter from the offeror as to the definite terms. I have deposited the money with Headquarters subject to approval by the Supreme Lodge and/or the officers of the Sanitorium corporation.

"I told Brother Bruskas in Washington, not having received an answer to my previous letter as to the offeror, that we are sending the Supreme Treasurer, Brother C. G. Paris, to Albuquerque, with full power to go into the transaction further with you and such others that may be interested and close the matter once and for all.

"When Brother Paris comes there, which will be next Sunday or Monday, you will please accord him every facility and extend to him every explanation that may be necessary in order to realize the maximum returns from this investment.

"Cordially and fraternally yours,

"s/ Harris J. Booras

"Harris J. Booras

"Supreme President"

A few days later Ahepa sent the two representatives named in the foregoing letter to Albuquerque. They advised Ades and Bruskas that they had been instructed to repudiate the transaction and tendered them a repayment of the $10,000 which Ahepa had received with Ades's letter of October 20, 1945. This tender of repayment and subsequent ones were refused by the plaintiffs because of their belief that they had made an enforceable contract to buy the sanatorium property and not because of any deficiency as to time, manner, amount or other circumstances of the tender.

Under date of November 15, 1945, Ahepa proceeded to offer the sanatorium property for sale by publicly soliciting bids. Thereupon, on December 3, 1945, Ades and Bruskas filed their complaint in this cause.

The defendants filed their answer in which (1) the existence of a contract was denied; (2) sufficiency of the writings relied upon as showing a contract to satisfy the statute of frauds was raised; (3) fraud of the plaintiffs was charged; and (4) lack of clean hands on the part of plaintiffs was interposed as a defense. The filing of the defendants' joint answer was followed by the taking of the plaintiffs' depositions at the instance of the defendants and their filing with the papers in the cause. Thereupon the defendants moved for summary judgment attaching to the motion the

affidavit of one of defendants' attorneys denying the existence of any agreement in writing sufficient to satisfy the statute of frauds and enumerating the documents bearing upon same, the grounds of said motion being, to-wit:

"(a) That there is no genuine issue of fact upon the question that the purported contract sued upon is not a contract.

"(b) That there is no genuine issue of fact upon the question that the purported contract sued upon is not evidenced by an adequate written memorandum as required by the Statutes of frauds."

The plaintiffs filed their motion to make more definite and certain directed to the motion for summary judgment above mentioned. This provoked the defendants' clarifying Response which was filed with the papers in the cause. The trial court thereupon entered its decree which, so far as material, reads as follows:

"* * * the Court having examined the pleadings and exhibits thereto and having read the depositions and exhibits thereto on file herein and having heard the arguments of counsel; and the Court having determined on the basis of the foregoing that there is no genuine issue of material fact requiring a trial as to the following matters:

"1. That the negotiations of the parties as evidenced by the testimony of the plaintiffs in their deposition and by the exhibits to the Complaint and said depositions did not constitute or result in a contract.

"2. That the written instruments exchanged by the parties as shown by the pleadings, depositions and exhibits are insufficient to satisfy the requirements of the Statute of Frauds;

and the Court having found and ruled that either of the foregoing propositions as to the truth of which there is no genuine issue of fact constitute a complete defense to the plaintiffs' cause of action herein; thereupon, upon consideration thereof

"It is ordered, adjudged and decreed that the complaint and cause of action of the plaintiffs be, and it hereby is, dismissed with prejudice to which the plaintiffs object and except."

■ Counsel for plaintiffs question applicability of 1941 Comp. § 19-101(56), known also as District Court Rule 56. The pertinent provisions read:

"(b) For Defending Party. A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof.

"(c) Motion and Proceedings Thereon. The motion shall be served at least ten

days before the time specified for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that, except as to the amount of damages, there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

We entertain no doubt of the propriety of invoking this rule if the defendants are to be sustained on either ground of the motion for summary judgment upon which they rely. See 3 Moore's Federal Practice, c. 56; Johnston-Crews Co. v. United States, D.C., 38 F.Supp. 544; Ex parte Peterson, 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919; Norwood Morris Plan Co. v. McCarthy, 295 Mass. 597, 4 N.E.2d 450, 107 A.L.R. 1215, and Annotation in 69 A.L.R. 1031.

The plaintiff, Bruskas, presents two principal claims of error. It should be here stated that the sole heir and personal representative of Ades, the co-plaintiff, who died pendente lite, and who was substituted as a party plaintiff in his stead, does not join in this appeal. The two claims of error mentioned are that (1) the court erroneously ruled there was no contract formed and (2) the pertinent writings involved do not meet the requirements of the statute of frauds in their failure to identify with reasonable certainty the plaintiffs,

Ades and Bruskas, as the purchasers. If either claim of error is ruled against the plaintiff, Bruskas, sole appellant, it becomes unnecessary to consider the other. This being true, we pass the question whether the court correctly decided that the negotiations relied upon did not result in a contract and enter immediately into a determination of the equally vital one: Do the pertinent writings meet the requirements of the statute of frauds in identifying the plaintiff, Bruskas, with reasonable certainty, as one of the purchasers?

The question whether Ades, himself, is disclosed with certainty by the writings as a purchaser is clouded by some doubt. The telegram of offer dated October 20, 1945, indicates considerable confusion on the subject. While addressed to Ades, it draws a distinction between him and the person referred to as "offeror" and again differentiates by designating them as *"you* and *offeror."* (Emphasis ours.) This same confusion is evidenced by the letter to Ades of October 29th, following, wherein Supreme President Booras states:

"In the meantime, I would like to know as to *who is purchasing the property* and the address of same, for, according to your letter, it seems that you have sent the check and that you seem to be the purchaser." (Emphasis ours.)

However, we need not be so much concerned whether Ades is sufficiently identi-

fied by the writings as a purchaser. The trial court ruled against him on the sufficiency of the writings to satisfy the statute of frauds and that ruling must stand since no appeal was prosecuted from the final decree by Corinne Silva Ades, substituted as a party plaintiff in his place and stead, both as the administratrix of his estate (he having died intestate, pendente lite) and as his sole heir at law and the next of kin. The plaintiff, Bruskas, thus appears before us as sole appellant. In order to secure a reversal, he must establish that the writings sufficiently identify him as a party purchaser to satisfy the requirements of the statute of frauds. The final decree gives an adverse answer as to the identification of both Ades and Bruskas. The former, or rather his personal representative and sole heir substituted as a plaintiff in his stead, has acquiesced in that adjudication, leaving only Bruskas to challenge the ruling.

█ The statute of frauds is with us as a part of the common law, 1941 Comp. § 19-303; Browning v. Browning, 3 N.M. (Gild.) 659, 3 N.M. (John.) 371, 9 P. 677; Childers v. Talbott, 4 N.M. (Gild.) 336, 4 N.M. (John.) 168, 16 P. 275. Restatement of the Law, Contracts, 207, speaks on the subject of identification under the statute as follows:

"§ 207. General Requisites of a Memorandum. A memorandum, in order to make enforceable a contract within the Statute, may be any document or writing, formal or informal, signed by the party to be charged or by his agent actually or apparently authorized thereunto, which states with reasonable certainty,

"(a) each party to the contract either by his own name, or by such a description as will serve to identify him, or by the name or description of his agent."

In 37 C.J.S., Frauds, Statute of, § 193, p. 677, the rule is stated:

"To satisfy the statute of frauds the memorandum must state who are the parties to the contract, either by naming them, or by so designating or describing them that they may be recognized or identified without fair or reasonable doubt or dispute."

For authorities sustaining the foregoing texts, see 27 C.J. 275; 49 Am.Jur. 649; 2 Williston on Contracts, Rev.Ed., 1622, § 569; Grafton v. Cummings, 99 U.S. 100, 25 L.Ed. 366; Freeman v. Fishman, 245 Mass. 222, 139 N.E. 846.

The name of Bruskas appears nowhere in the critical memoranda—the telegram of offer and the letter acknowledging exchanged between Ades and Supreme President Booras on October 20, 1945. Indeed, not in any writing until the letter of November 7, 1945, from President Booras to Ades, does the name of Bruskas appear in the transaction, and the context found in connection with the mention of

his name in this letter itself repudiates any identification of him as one of the purchasers. It reads:

"I told Brother Bruskas in Washington, not having received an answer to my previous letter as to the offeror, that we are sending the Supreme Treasurer, Brother C. G. Paris, to Albuquerque, with full power to go into the transaction further with you and such others that may be interested and close the matter once and for all."

█ Nor can the memoranda be held to meet the requirements of the statute of frauds in this connection on the theory that Ades acted as agent for Bruskas as an undisclosed principal. The rule applicable is as follows:

"Except in a few jurisdictions where the contrary is held, it is a rule that the memorandum fails to designate one of the contracting parties and is insufficient in this respect where it discloses that a person named therein is avowedly acting as agent for someone else who is not named or described." 37 C.J.S., Frauds, Statute of, § 193, p. 679.

█ Still another reason would intervene to deny validity to the memoranda as an enforceable contract under the statute of frauds, since where agent is also a purchaser along with the principal, agent's signature alone is insufficient to bind the principal. Freeman v. Fishman, supra. If, as Bruskas contends, Ades was acting as agent for him as well as for himself, he nowhere signed as agent for Bruskas.

It follows from what has been said that the decree of the district court is correct and should be affirmed.

It is so ordered.

BRICE, C. J., and LUJAN, McGHEE, and COMPTON, JJ., concur.